**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X

UNITED STATES OF AMERICA

                        **REPORT AND**
                        **RECOMMENDATION**

     - against -

                        CR 06-0736 (ERK) (JO)

KAMAL BANDYOPADHYAY,

                  Defendant.

--------------------------------------------------------X

**JAMES ORENSTEIN, Magistrate Judge:**

       Defendant Kamal Bandyopadhyay ("Bandyopadhyay"), who is awaiting trial on twenty counts of receiving and possessing child pornography, has filed omnibus motions seeking the suppression of certain statements made to government agents on several different occasions, the suppression of physical evidence seized pursuant to an allegedly overbroad search warrant, an order compelling the government to produce certain discovery, and a declaration of unconstitutionality as to certain provisions of the Adam Walsh Child Protection and Safety Act, Pub. L. No. 109-248, 120 Stat. 587 (July 27, 2006) (the "Walsh Act"), pertaining to discovery and bail.[1] The Honorable Edward R. Korman, United States District Judge, referred the motions to me for a report and recommendation. Electronic order dated May 29, 2007. Following extensive proceedings, including an evidentiary hearing and the submission of pre- and post-hearing briefs, I now make my report and, for the reasons set forth below, respectfully recommend that the court deny all of Bandyopadhyay's motions. I discuss the facts and law relevant to each motion in turn.

---

[1] The charges are set forth in a superseding indictment that was filed on October 5, 2007. Docket Entry ("DE") 61. Bandyopadhyay formally filed his motions on August 6, 2007, while the original indictment, which alleged fewer charges, was still pending. DE 41 (motions related to suppression and discovery); DE 43 (constitutional challenge to conditions of release). The addition of new charges does not alter the outcome I recommend as to any motion.

I.      Bandyopadhyay's Statements

Bandyopadhyay seeks to suppress written and oral statements given to government agents on four separate occasions:  during a visit from government officials on February 26, 1999, while he was incarcerated in Ecuador; during the execution of a search warrant at an apartment he owned on July 26, 2006; during a later, pre-arranged visit by agents to his home on August 29, 2006; and following his arrest on October 6, 2006.  As explained below, the motion lacks merit as to each such statement – either because the government does not seek to offer the statement, because Bandyopadhyay did not make the statement in custody, or because the government respected his rights while conducting the custodial interrogation that produced it.

A.      Applicable Law

As a general rule, a court must prohibit the government from introducing in its case-in-chief any statements elicited from the custodial interrogation of a suspect who was not first warned of certain constitutional rights.  *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966); *Dickerson v. United States*, 530 U.S. 428, 443-44 (2000) (declaring unconstitutional a statute designed to obviate the prophylactic rule of *Miranda*); *United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004) (citing *Michigan v. Harvey*, 494 U.S. 344, 350 (1990); *Parsad v. Greiner*, 337 F.3d 175, 184 (2d Cir. 2003)).  The *Miranda* rule is triggered only by an interrogation to which a person is subjected while in "custody" rather than by "the coercive pressures of a particular interrogation."  *Newton*, 369 F.3d at 671.  As courts in this circuit recognize,

> [a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. *Miranda* does not reach so broadly.

*Id*. at 668 (internal quotations omitted).

In determining whether a given interrogation was custodial, a court asks first "whether a reasonable person would have thought he was free to leave the police encounter at issue[,]" and second, whether, under the circumstances of the seizure, "a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Id*. at 671, 672. Both prongs of the inquiry are objective; the subjective views of the interrogating officers or the person being questioned are irrelevant. *United States v. Ali*, 68 F.3d 1468, 1472 (2d Cir. 1995) (citing *Stansbury v. California*, 511 U.S. 318 (1994) (*per curiam*)), *modified on other grounds*, 86 F.3d 275 (2d Cir. 1996). Thus, if a reasonable person under the circumstances of the interrogation at issue would not have believed himself free to leave and would have associated the constraint on his liberty to be of a degree equivalent to arrest, the interrogation was custodial and the resulting statements must be suppressed unless the suspect was warned of his rights. *Miranda*, 384 U.S. at 444; *Newton*, 369 F.3d at 672.

Such an inquiry is fact-intensive but is informed by certain established legal principles, several of which are relevant here. For example, "absent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial." *Newton*, 369 F.3d at 675 (citing *United States v. Mitchell*, 966 F.2d 92, 99 (2d Cir. 1992)). Similarly, a suspect is not in custody "merely because he is told to remain in one place." *United States v. Pescatore*, 2006 WL 467948, at *3 (E.D.N.Y. Feb. 27, 2006) (defendant not in custody when he and others told to "stay where they were" while officers secured building) (citing *United States v. Badmus*, 325 F.3d 133, 139 (2d Cir. 2003) (defendant not in custody when asked to stay seated in living room and not allowed to move freely about apartment while officers conducted search)). In contrast, handcuffs are "generally recognized as a hallmark of [custody]." *Newton*, 369 F.3d at 676 (defendant in custody when handcuffed despite being in own home and being told he was not

under arrest) (citing, among other cases, *Dunaway v. New York*, 442 U.S. 200, 215 & n.17 (1979); *United States v. Maguire*, 359 F.3d 71, 79 (1st Cir. 2004)).

B.    February 26, 1999

Bandyopadhyay was arrested in 1998 in Ecuador and subsequently imprisoned there.  He now moves to suppress statements made to an agent of the Bureau now known as Immigration and Customs Enforcement ("ICE") who, along with a consular official, visited Bandyopadhyay in prison on February 26, 1999.  *See* DE 42 (Memorandum Of Law In Support Of Defendant's Pretrial Motions) ("Memo.") at 3; DE 41-2 (Affirmation of Paul Testaverde) Ex. 7 (ICE report dated Feb. 26, 1999).  Bandyopadhyay argues in the alternative that the statements he made that day were the product of custodial interrogation in the absence of *Miranda* warnings and that he could not in any event have made a valid waiver of his rights given the effects of his alleged mistreatment in Ecuadorian custody.  Memo. at 3; *see also* DE 41-3 (Affidavit of Kamal Bandyopadhyay) ("Bandyopadhyay Aff.") ¶¶ 5-10, 12, 14, 17.  The government has agreed not to use any statements Bandyopadhyay made on February 26, 1999, in its case-in-chief.  DE 45 (Government's Memorandum Of Law In Opposition To Defendant's Pre-Trial Motions) ("Opp.") at 5.  As a result, Bandyopadhyay agrees that his motion to suppress his 1999 statements is moot. DE 46 (Defendant's Reply Memorandum Of Law In Response To Government's Memorandum Of Law In Opposition To Pretrial Motions) ("Reply") at 2.

C.    July 26, 2006

1.    Factual Background

The following factual recitation is based on the uncontested portions of Bandyopadhyay's affidavit and the testimony I received at an evidentiary hearing on September 6, 2007.  The government called one witness at that hearing:  ICE Special Agent Nicholas Raudenski

4

("Raudenski"). Bandyopadhyay chose not to present any testimony. *See generally* DE 62 (corrected transcript of hearing) ("Tr."). I generally found Raudenski to be credible; to the extent there is any disagreement between his testimony and Bandyopadhyay's affidavit – the allegations of which Bandyopadhyay declined to subject to adversarial testing through cross-examination – I credit the former. Indeed, Bandyopadhyay's counsel agreed that the record I may properly consider consists exclusively of Raudenski's testimony and only the uncontested portions of Bandyopadhyay's affidavit. Tr. at 66.

On the morning of July 26, 2006, ICE agents Raudenski and Cerutti went to Bandyopadhyay's residence on 31st Avenue in the Astoria section of Queens (the "Residence"), armed with a search warrant for a different apartment – located nearby on 34th street – that Bandyopadhyay also owned (the "Apartment"). Tr. at 13-14; Bandyopadhyay Aff. ¶ 18. Bandyopadhyay allowed the agents inside his Residence and reviewed the search warrant. The agents asked Bandyopadhyay if he would accompany them to the Apartment and unlock a gate to permit their entry. Bandyopadhyay agreed. Tr. at 14-15, 29, 59. During the walk from the Residence to the Apartment, Raudenski informed Bandyopadhyay that other ICE agents were awaiting their arrival, but that Bandyopadhyay should not be concerned.[2] Raudenski also told Bandyopadhyay that if he continued to cooperate with the agents, "there wouldn't be any problems." Tr. at 16. Five or six additional ICE agents were waiting outside the Apartment when the men arrived. Pursuant to ICE procedure for execution of a search warrant, all of the agents, including Raudenski and Cerutti, were armed. Some of the agents may have been

---

[2] Bandyopadhyay claims he was *directed* to accompany the agents from his Residence to the Apartment, and that the agents positioned themselves in front of and behind Bandyopadhyay, respectively, as they walked. Bandyopadhyay Aff. ¶ 18. Raudenski could not recall if the three men were so situated at any given point during the short trip, but testified that they proceeded "casually." Tr. at 37-38.

5

dressed in a way that allowed an observer to see that they were armed, but all of the agents kept their weapons holstered at all times.  Tr. at 16, 48, 12.

Upon entering the Apartment, Raudenski and fellow agent Marcus Castro ("Castro") asked Bandyopadhyay if he would speak with them while the remaining agents conducted the search.  Bandyopadhyay agreed, and the three men moved to a small, cluttered room offset from the main area of the Apartment (the "Interview Room").  Tr. at 17-18, 42-43.  Bandyopadhyay offered both agents a chair, and himself sat on an overturned bucket.  Tr. at 17-18.  Raudenski requested that Bandyopadhyay stay in the Interview Room so as not to "startle" the agents conducting the search, but never stated that Bandyopadhyay was not free to leave.  Tr. at 20-21.  Raudenski led the interview; Castro was the only other agent present in the room throughout.  Tr. at 45.  Raudenski informed Bandyopadhyay at the outset that he was not under arrest and was not obligated to speak with the agents.  Bandyopadhyay appeared outwardly nervous and asked if he needed a lawyer; Raudenski responded that it was within Bandyopadhyay's rights to have counsel present and that Bandyopadhyay could choose not to answer any particular question or to terminate the interview at any time.  Tr. at 18.  Bandyopadhyay did not ask that he be permitted to contact his lawyer, Tr. at 60, and consented to the interview.  Tr. at 18-19.

The agents questioned Bandyopadhyay for a period of approximately 60 to 90 minutes.  Tr. at 49.  During portions of the interview, Raudenski's supervisor, D.J. McSweeney ("McSweeney"), stood in the doorway area that provided the only egress from the Interview Room.  Tr. at 47.  At no time did Bandyopadhyay ask to terminate the interview.  Tr. at 21.  He did, however, refuse to answer one of Raudenski's questions (regarding a family with which Bandyopadhyay had stayed on a previous trip to Ecuador).  The agents honored Bandyopadhyay's refusal and moved to their next question.  Tr. at 19-20.  At the interview's

conclusion, Bandyopadhyay expressed his willingness to cooperate with the investigation; specifically, he told the agents that they could come back at any point to conduct a follow-up search and did not need to obtain a warrant before doing so.  Tr. at 21.

At some point after the interview on July 26, 2006 (but before Bandyopadhyay's arrest on October 6, 2006), Bandyopadhyay called Raudenski seeking an update on the status of the case. During their conversation, Bandyopadhyay sought Raudenski's permission to travel overseas. Tr. at 24-25.  Raudenski answered that he would appreciate being notified of any such plans, but that Bandyopadhyay was free to make whatever travel plans he wished.  Tr. at 24-25, 56-57.

2.  Analysis

Bandyopadhyay must demonstrate that the statements he seeks to suppress were the result of custodial interrogation.  I conclude that he has failed to make such a showing.  In his attempt to demonstrate that the objective circumstances gave him reason to believe he was not free to leave and that he was subject to restraints comparable to formal arrest, Bandyopadhyay relies on four specific characterizations of the circumstances surrounding his interrogation. First, he asserts that the ICE agents ordered him to accompany them from the Residence to the Apartment, and that the agents positioned themselves in front of and behind him during the journey.  Second, he argues that Raudenski impliedly threatened adverse consequences if Bandyopadhyay refused to cooperate with the investigation.  Third, Bandyopadhyay relies on the assertion that the agents directed him to sit in a particular location during the interrogation and forced him to remain there by surrounding him.  Finally, Bandyopadhyay argues that his interrogators, by advising him of certain rights (albeit not the full *Miranda* warnings), caused him reasonably to believe that he was in custody.  Reply at 2-3; DE 56 (Bandyopadhyay's Post-Hearing Supplemental Brief) ("Supp. Brief") at 1-3.  I address each claim in turn.

7

The record does not support Bandyopadhyay's assertion that the agents ordered him to accompany them from the Residence to the Apartment. According to Raudenski's uncontroverted testimony, the agents requested that Bandyopadhyay accompany them to the Apartment, and he agreed. Tr. at 15, 59. Even assuming that the agents positioned themselves in front of and behind Bandyopadhyay during that walk, a reasonable person in his position would not have inferred from that fact that he was not free to go elsewhere, nor would such a reasonable person have understood himself to be subject to restraints comparable to those associated with arrest.

The basis on which Bandyopadhyay argues that he was threatened with adverse consequences if he did not cooperate with the agents is the following portion of Raudenski's testimony:

> Q. Did you speak with the defendant while en route from his apartment – from his home to the subject premises?
>
> A. Yes, we did. We were just basically telling him that, you know, he didn't have any cause to be concerned, but there are other agents that were going to be waiting there; so he shouldn't be alarmed. And that if, you know, he continued to cooperate, there wouldn't be any problems, and we appreciated him accompanying us over there to let us in.

Tr. at 16. According to Bandyopadhyay, Raudenski's assurance that "there wouldn't be any problems" if Bandyopadhyay cooperated also "conveyed its corollary:" that Bandyopadhyay would face consequences if he ceased to cooperate. Supp. Brief at 2. I disagree. Raudenski's assurance was just that; as a matter of logic it did not necessarily imply a threat if Bandyopadhyay was uncooperative. More fundamentally, whether Raudenski implied (or Bandyopadhyay reasonably inferred) a threat is irrelevant: such a threat would have been insufficient to cause a reasonable person in Bandyopadhyay's position to believe he was not free

to leave or subject to arrest-like restraints. If anything, the request for cooperation – even if backed up by a veiled threat – suggested that Bandyopadhyay was *not* under arrest, as an arrest signals the point at which the police stop asking for cooperation and simply seize a person regardless of the extent to which he cooperates.

The record likewise fails to support Bandyopadhyay's assertions about being directed to sit in a particular spot during the interview and being surrounded by the agents. Raudenski's testimony established that regardless of the number of agents executing the search warrant in the Apartment, the only agents present in the Interview Room throughout the interrogation were himself and Castro. Tr. at 45. Raudenski's supervisor, McSweeney, stood in the doorway intermittently. Tr. at 47.[3] On these facts I cannot conclude that Bandyopadhyay was surrounded. *See Pescatore*, 2006 WL 467948 at *3 (finding no basis for defendant's contention that he was "surrounded by dozens of law enforcement agents" when he was questioned by two or three agents in his office while up to 50 others searched the premises of his business).

Raudenski testified specifically that he *asked* Bandyopadhyay to remain in the interview room while additional agents conducted the search. Tr. at 20-21. To the extent that his request can fairly be characterized as a direction, it may have caused a reasonable person to believe he was not free to leave, but it nonetheless does not establish custody for purposes of *Miranda*. *See Pescatore*, 2006 WL 467948 at *3 (defendant not in custody when he and others told to "stay where they were" while officers secured building) (citing *Badmus*, 325 F.3d at 139 (defendant not in custody when asked to stay seated in living room and not allowed to move freely about apartment while officers conducted search)).

---

[3] Bandyopadhyay's counsel argued that McSweeney's mere presence in the doorway while he listened to a portion of the interview meant that he was blocking the doorway and would not make way if Bandyopadhyay sought to leave the interview room. Tr. at 72. I disagree.

Bandyopadhyay's final argument is that warning an interrogation subject of some rights, but not the full set of *Miranda* warnings, is an objective indication that the person is under arrest. *See* Reply at 3; Tr. at 84-85. Again, I disagree. As an initial matter, I note that the argument's persuasive value is not helped by Bandyopadhyay's failure to cite any case that has adopted it. Nor is that failure a matter of oversight: as far as I can determine there is no reported decision that has accepted such an argument. The argument also fails to persuade me because it is internally inconsistent. The reasonableness of the inference that a person is under arrest because an agent has informed her of some of her constitutional rights implicitly relies on a proposition that the Supreme Court has stated explicitly: "*Miranda* has become embedded in routine police practice to the point where the warnings have become part of our national culture." *Dickerson v. United States*, 530 U.S. 428, 443 (2000) (citing *Mitchell v. United States*, 526 U.S. 314, 331-332 (1999)). But the argument proves too much; as the Supreme Court recognized, it is not simply the *process* of being warned but "the warnings" that have become "part of our national culture" as an unmistakable sign of being placed under formal arrest. A person in Bandyopadhyay's circumstances, who was subjected to no other restraint on his liberty, would have no reason to think he was under arrest simply because an agent provided a warning that was *not* a recitation of the familiar *Miranda* rights – to the contrary, such a person would understand that whatever the reason for the warning, it was not an indication that he was being taken into custody.

Bandyopadhyay's argument, if successful, would also create a dangerous precedent. Law enforcement agents have all sorts of interactions with members of the public that do not, and should not, result in a formal arrest. It is entirely appropriate that such agents should, in the course of such interactions, feel free to inform the persons with whom they are speaking of their rights (to the extent that such warnings, and the necessary identification of the agent as a law

enforcement officer, would not compromise the agent's mission). A rule that would recognize such warnings as a sign of arrest – thereby risking suppression if the warnings did not needlessly include the full panoply of rights described in *Miranda* – would create a perverse incentive for agents to withhold such useful information. Thus the rule Bandyopadhyay advocates would harm, rather than help, those who will later find themselves in circumstances similar to those in which he found himself on July 26, 2006.

Bandyopadhyay asserts that he had the subjective impression that he was in custody during his interview, Tr. at 70, and the evidence of his post-interview call to Raudenski seeking permission to travel abroad provides at least arguable support for the veracity of that assertion. The court need not accept or reject Bandyopadhyay's assertion to decide the instant motion, as it is irrelevant to the legal question the motion presents. *See Ali*, 68 F.3d at 1472 (citing *Stansbury*, 511 U.S. at 318). It is not his subjective impression that controls, but the objective circumstances – and just as the objective circumstances would not have led a reasonable person to believe he was in custody, so too would those circumstances provide no basis for a reasonable person to believe that he needed Raudenski's permission to travel after the interview concluded. Similarly irrelevant is evidence that Bandyopadhyay was noticeably nervous throughout his encounter with the agents on July 26, 2006. It is hardly surprising that "a measure of anxiety always results from police officers confronting an individual with a search warrant, but that is typically not enough to constitute custody for a *Miranda* analysis." *United States v. Gaynor*, 2007 WL 1875651, at *3 (D. Conn. June 28, 2007).

Considering the totality of the circumstances, I cannot conclude that a reasonable person in Bandyopadhyay's position on July 26, 2006, would have understood himself to be subject to restraints comparable to formal arrest. The agents repeatedly told Bandyopadhyay that he was

not under arrest, that he was under no obligation to answer questions, and that he could terminate interrogation at any point. He nevertheless consented to an interview in the familiar confines of an apartment the he owned and used. *See Newton*, 369 F.3d at 675 (citing *Mitchell*, 966 F.2d at 99). When the agents asked a question that Bandyopadhyay did not wish to answer, they honored his refusal. Bandyopadhyay was never handcuffed nor faced with a drawn weapon, and he was left to go about his business when the agents concluded their search. These objective facts, which are not in dispute, compel the conclusion that Bandyopadhyay was not in custody when he made the statements he now challenges. As a result, I respectfully recommend denying this portion of his motion to suppress.

      D.    <u>August 29, 2006</u>

Shortly after executing the search warrant on July 26, 2006, Raudenski made a telephone call to Bandyopadhyay. Raudenski mentioned that one of his colleagues had accidentally left a wallet in the Apartment that day, and he asked for an opportunity to visit Bandyopadhyay at his Residence to retrieve the wallet and conduct a follow-up interview. Bandyopadhyay agreed. The two eventually arranged to meet at the Residence on August 29, 2006. Tr. at 60-61, 22-23.

On the appointed day, Raudenski and a fellow ICE agent arrived at Bandyopadhyay's building at about the pre-arranged time. From the street, the agents rang up to the Residence and Bandyopadhyay, from inside his home, buzzed them into the building. Tr. at 61. The agents then went to the Residence and knocked on the door, identified themselves, and asked if they could come inside. Tr. at 23, 61. Bandyopadhyay admitted the agents to his residence, at which point Raudenski again informed Bandyopadhyay that he was not under arrest and that he was under no obligation to answer any of the questions posed to him. Bandyopadhyay spoke with the agents for approximately 20 to 30 minutes. Tr. at 24, 53.

Based on these facts I cannot agree with Bandyopadhyay that he was in custody during the interview on August 29, 2006. He agreed to the interview in advance, and then later made a separate decision to let the agents into his home once they arrived. The agents questioned Bandyopadhyay in the familiar surroundings of his home and explicitly said that he was *not* under arrest before beginning their interview. Aside from the argument discussed and rejected above about the significance of being warned of some of his rights, Bandyopadhyay points to nothing about the August 29 encounter that would even arguably cause a reasonable person to believe that his freedom to leave was restricted or that he was subject to arrest-like restraints. Indeed, his second encounter with Raudenski involved even less of a police presence then he had faced during the execution of the search warrant the month before; and in addition, Bandyopadhyay had the advantage at the second encounter of knowing for certain that the first one had ended without an arrest.

If the circumstances of this second interview were held to constitute police custody for purposes of *Miranda*, I cannot conceive of any circumstances that would qualify as a non-custodial investigative interview. Bandyopadhyay effectively seeks a ruling that would make every police interview a custodial interrogation. The courts of this circuit have already rejected that argument and ruled that "*Miranda* does not reach so broadly." *Newton*, 369 F.3d at 671.

E.    October 6, 2006

On October 6, 2006, Raudenski executed a warrant for Bandyopadhyay's arrest. He warned Bandyopadhyay of his *Miranda* rights and then asked if Bandyopadhyay would be willing to answer questions. Bandyopadhyay said that he would. Having obtained a voluntary, knowing, and intelligent waiver of the defendant's rights, Raudenski then questioned Bandyopadhyay until, in response to a question concerning his activities in Ecuador,

Bandyopadhyay requested an attorney. Raudenski asked no further questions and immediately terminated the interview. Tr. at 25-26.

Notwithstanding representations to the contrary at oral argument, *see* Tr. at 87-88, Bandyopadhyay apparently does not dispute that Raudenski properly issued the *Miranda* warnings and obtained a waiver before interrogating him on October 6, 2006. Supp. Brief at 1; *see also* Memo. at 5; Reply at 4 n.4. Rather, he claims that Raudenski continued to question him after he asked to speak with a lawyer, in violation of *Edwards v. Arizona*, 451 U.S. 477, 485 (1981). Bandyopadhyay Aff. ¶ 20. *Edwards* indeed prohibits reinterrogation after a suspect has invoked his right to counsel (at least until counsel has been made available or the accused of his own volition initiates further communication, *id.*), and Bandyopadhyay states clearly in his affidavit that, after being placed under arrest on October 6, 2006, he asked for and was refused a lawyer prior to questioning.

Bandyopadhyay provides virtually no argument on this point in three substantive memoranda submitted in support of his motion. *See* Memo. at 7 (quoting the rule established by *Edwards* but making no reference to the events of October 6, 2006); Supp. Brief at 1 (stating only that Bandyopadhyay "do[es] not concede that the government complied with *Edwards v. Arizona*). His failure to do so is just as well because there is no factual support for any argument under *Edwards*. I credit Raudenski's testimony on the matter and decline to rely on the contrary assertion in Bandyopadhyay's affidavit that has not been tested under cross-examination. Accordingly, because Bandyopadhyay was not interrogated after invoking his right to counsel, I respectfully recommend that the court deny this portion of his motion to suppress.

II.     Physical Evidence

    A.     The Particularity Challenge

    Bandyopadhyay moves to suppress physical evidence seized from the Apartment on July

26, 2006, on the ground that the warrant authorizing the search failed to state with particularity

the items to be seized.  Memo. at 10-12.[4]  He focuses his attack on two paragraphs of the "List

Of Items To Be Seized" that was attached to, and incorporated by reference in, the warrant:

>     2.     Computers, computer hardware, computer software, floppy discs, compact
>     discs and any other form of computer storage devices, computer related
>     documentation, computer passwords and data security devices, cameras, digital
>     video discs, videotapes, video recording devices, video recording players, and
>     video display monitors that may be, or are used to:  visually depict child
>     pornography or child erotica; display or access information pertaining to a sexual
>     interest in child pornography; display or access information pertaining to sexual
>     activity with children; or distribute, possess, or receive child pornography, child
>     erotica, or information pertaining to an interest in child pornography or child
>     erotica.
>
>     3.     Any and all computer software, including programs to run operating
>     systems, applications (such as word processing, graphics, or spreadsheet
>     programs), utilities, compilers, interpreters, and communications programs,
>     including, but not limited to, programs related to IRCs, file servers, and/or peer-
>     to-peer sharing.

DE 1 (Search Warrant) at Attachment A (List of Items To Be Seized) ¶¶ 2, 3 (respectively,

"Paragraph 2" and "Paragraph 3").  For the reasons set forth below, I respectfully recommend

that the court deny this portion of Bandyopadhyay's motion to suppress.

    A search warrant must "particularly describ[e] the place to be searched, and the persons

or things to be seized."  U.S. Const. Amend. IV; *Dalia v. United States*, 441 U.S. 238, 255

_____

[4]     Bandyopadhyay also initially moved to suppress evidence allegedly seized from his residence
while he was imprisoned in Ecuador.  Memo. at 9-10.  The government has repeatedly stated that
it is unaware of any such evidence, Opp. at 14; DE 40 (Transcript of Status Conference Held on
July 10, 2007) ("July 10 Tr.") at 49-50, and Bandyopadhyay therefore agrees that the instant
motion is limited to physical evidence seized on July 26, 2006.  Reply at 5.

(1979).  The particularity requirement is designed to guard against "general searches ... and [to prevent] the seizure of one thing under a warrant describing another."  *Marron v. United States*, 275 U.S. 192, 196 (1927).  By its terms, the Fourth Amendment requires particularity in the warrant itself, not only in the supporting documents submitted to the judicial officer.  *Groh v. Ramirez*, 540 U.S. 551, 557 (2004) (citing *Massachusetts v. Sheppard*, 468 U.S. 981, 988, n.5 (1984) ("a warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional"); *United States v. Stefonek*, 179 F.3d 1030, 1033 (7th Cir. 1999) ("[t]he Fourth Amendment requires that the warrant particularly describe the things to be seized, not the papers presented to the judicial officer ... asked to issue the warrant")).  However, a warrant may cross-reference other documents, as long as the warrant uses appropriate words of incorporation and the supporting documents accompany the warrant.  *Groh*, 540 U.S. at 557-58.[5] A warrant must enable searching officers to "ascertain and identify with reasonable certainty those items that the Magistrate has authorized [them] to seize," *United States v. George*, 975 F.2d 72, 75 (2d Cir. 1992), but it need not eliminate all discretion on their part.  *United States v. Riley*, 906 F.2d 841, 844-45 (2d Cir. 1990).  Broadly worded categories of items to be seized do not necessarily render a warrant defective – if the warrant contains "an illustrative list of seizable items," it should be construed in light of that list.  *United States v. Smith*, 2007 WL 2088938, at *2 (W.D.N.Y. July 19, 2007) (citing *Riley*, 906 F.2d at 844).

---

[5]    In *United States v. Bianco*, the court carved out a narrow exception to the incorporation requirement where it was clear that both the defendant and the searching agents were aware of the scope of the search and the affidavit supporting the warrant was present at the time of the search.  998 F.2d 1112, 1116-17 (2d Cir. 1993).  It is not clear, however, that the *Bianco* exception survives the Supreme Court's later decision in *Groh*.  *See United States v. Vilar*, 2007 WL 1075041, at *22 n.13 (S.D.N.Y. Apr. 4, 2007).

When evidence is seized pursuant to a defective warrant, suppression is the usual, but not inevitable, remedy. If law enforcement relies in good faith on insufficiently particular language in a warrant, evidence seized pursuant to the warrant is admissible against the defendant at trial notwithstanding the defect. *See United States v. Leon*, 468 U.S. 897, 919-21 (1984); *George*, 975 F.2d at 77 (citing *Leon*); *United States v. Hunter*, 13 F. Supp. 2d 574, 584 (D. Vt. 1998).

I disagree with Bandyopadhyay's argument that Paragraph 2 lacks particularity. The paragraph authorizes the seizure of a specific set of computer-related items (not merely an illustrative list) and refers specifically to how those items can be used to disseminate child pornography, the subject of the crime with which Bandyopadhyay is charged. While the category of items the paragraph describes is unquestionably broad, it is not a "catch-all" category untethered to any information that would guide the officers' search. In that respect the warrant at issue here differs significantly from those at issue in the two cases that Bandyopadhyay cites for the proposition that a warrant authorizing a computer search must identify the items to be seized with as much particularity as possible. Supp. Brief at 4 (citing *George*, 975 F.2d at 75-76 (warrant insufficiently particular where it authorized a search for "any other evidence relating to the commission of a crime" and failed to specify the crime established by a showing of probable cause); *United States v. Hickey*, 16 F. Supp. 2d 223, 240 (E.D.N.Y. 1998) (warrant insufficiently particular where it authorized a search of "all business records" of four corporate defendants without reference anywhere in the warrant to the crime charged)). The specific references to child pornography in Paragraph 2 – which immediately follows the citation in the preceding paragraph to the statue under which Bandyopadhyay was later indicted and which defines child pornography, 18 U.S.C. §§ 2256(2), 2256(8) – also sufficiently "delineated the limits of [the agents] subsequent search" of Bandyopadhyay's hard drive to contraband of that nature. *Vilar*,

2007 WL 1075041 at *37 (citing *Hunter*, 13 F. Supp. 2d at 584). That the warrant itself is not more specific as to the scope of that subsequent search reflects the practical realities of computer-stored contraband: child pornography can be stored in any file, by any name. It is impossible to determine if a file contains evidence described in the warrant in advance of a thorough search.

Unlike Paragraph 2, Paragraph 3 uses broad language ("[a]ny and all computer software") divorced from any reference to the crimes for which the computer software was sought. As such, Paragraph 3 is inherently more susceptible to a finding of overbreadth. As a threshold matter, it is hard to see how the challenge to Paragraph 3 is anything other than moot: nothing in the record suggests that there is any evidence that the government will offer in evidence that was seized pursuant to Paragraph 3 that would not in any event have been properly subject to seizure under the sufficiently particularized language of Paragraph 2. Accordingly, even if it is true, as Bandyopadhyay argues, that "the only way to cure the [asserted] constitutional infirmity of [Paragraph 3] would be to delete it[,]" Supp. Brief at 4 n.3, as far as I can determine, such a deletion would have produced a constitutionally sound warrant and the seizure of the same evidence now at issue.

More substantively, the government persuasively responds that "the authorization to seize 'any and all computer software' is an obvious recognition of the fact that the agents cannot reasonably be expected to conduct a forensic examination of the defendant's computer hardware and software" during the execution of the warrant. Opp. at 15. Further, the warrant application explicitly explained why all of the software on the defendant's computer would have to be seized in order to find the evidence and instrumentalities of the crime under investigation. *See* DE 45-2 (Affidavit In Support Of Application For A Search Warrant) ("Warrant Aff.") ¶ 29. Thus, as

broadly worded as Paragraph 3 was, it was not any less particularized than the category of items that the issuing magistrate judge properly found to be subject to seizure by a showing of probable cause.[6]

I am persuaded that neither paragraph was constitutionally defective. However, I believe the better course for determining the motion is to assume that the warrant was overbroad, because Bandyopadhyay cannot prevail even with the benefit of that assumption. That is because the purported defect did not render the warrant "so facially deficient ... that the executing officers [could] not reasonably presume it to be valid." *Leon*, 468 U.S. at 923. In light of the difficulty of assessing the nature and content of a computer's files and software applications without conducting the kind of discerning analysis that would constitute a search for purposes of the Fourth Amendment, it was reasonable for the agents to believe that any of the items listed in Paragraphs 2 and 3 could constitute the evidence or instrumentalities of the offense under investigation for which a facially valid warrant had issued. In addition, the record contains no suggestion that the government seized anything from Bandyopadhyay's computer for any purpose other than that authorized by the warrant. *Hunter*, 13 F. Supp. 2d at 585 ("There is no indication that the government in fact sought the wholesale seizure of computer equipment so that every file could be scrutinized, for evidence of any violation of the law."). I therefore conclude that the agents' reliance on the warrant was reasonable and in good faith and that the evidence they seized should not be suppressed.

---

[6] To be clear: the significance of the application's explanation is *not* that it constructively narrows the scope of Paragraph 3. In the absence of any incorporating language in Paragraph 3, *Bianco* would forbid such analysis, even if the exception recognized in that decision remains good law after *Groh*. Instead, I note that the application provided a sufficient basis for the issuing magistrate judge to conclude that there was probable cause to authorize a search for "[a]ny and all software" that might be located in the Apartment.

B.    The Challenge Based On Statements Made In Ecuador

Notwithstanding the preceding analysis, Bandyopadhyay may still seek to suppress the physical evidence seized during the execution of the search warrant on the ground that the government, in its warrant application, impermissibly relied on the allegedly involuntary statements he made to an ICE agent while he was incarcerated in Ecuador. I deferred briefing on that issue because it might be mooted by the resolution of other aspects of Bandyopadhyay's motion. *See* DE 33. If the court adopts the preceding recommendations, the issue of the effect of the allegedly involuntary statements on the warrant application will become ripe for review. Bandyopadhyay will then have to show, at a minimum, that if the references to his Ecuador statements were to be deleted from the application for the warrant to search the Apartment, there would not have been probable cause to issue the warrant. *See, e.g.*, *United States v. Trzaska*, 111 F.3d 1019, 1026 (2d Cir. 1997); *United States v. Pitera*, 5 F.3d 624, 627 (2d Cir. 1993).[7]

In an effort to streamline the remaining proceedings in this case, I provide the following analysis. The warrant application did not rely in any meaningful sense on any statements that Bandyopadhyay made in Ecuador – or, more precisely, it had no need to do so. The application consisted of 35 paragraphs over 23 typed pages, of which only two paragraphs referred to statements that Bandyopadhyay had made in Ecuador over seven years earlier. *See* Warrant Aff. ¶¶ 23-24. On the other hand, the application had independent allegations specifically tying the Apartment to the use of an account in Bandyopadhyay's name to obtain access to child pornography images well after 1999. *See id*. ¶¶ 15-20.

_____

[7] I do not mean to suggest that the taint issue is the only one Bandyopadhyay would need to address if he decides to pursue the matter. For example, he would also have to establish that his statements to the visiting ICE agent were a product of coercion that is fairly attributable to the government of the United States rather than to that of Ecuador. *See, e.g.*, *United States v. Salameh*, 152 F.3d 88, 117 (2d Cir. 1998).

In light of that evidence, it is difficult to see how references to the statements made in Ecuador added anything to the application's showing of probable cause to believe that the evidence and instrumentalities of the offense under investigation would be found in the Apartment. Accordingly, unless there is some other basis for Bandyopadhyay's assertion that his allegedly involuntary statements in Ecuador tainted the admissibility of the physical evidence seized pursuant to a search warrant issued seven years later, I respectfully recommend that the court deny suppression on that ground as well rather than refer the matter for further briefing. Of course, if Bandyopadhyay does wish to make other arguments, he should certainly be given that opportunity, either in the form of objections to this Report and Recommendation, or in briefing submitted to me in the first instance.

III.    Discovery

Bandyopadhyay has repeatedly demanded that the government provide him with certain discovery that the government has repeatedly insisted it does not have. July 10 Tr. at 50; Memo. at 13-15; Opp. at 18-22; Reply at 8-10. Accordingly, absent any reason to question the accuracy of the government's consistent representations that it does not have what Bandyopadhyay seeks, the discovery motion is moot. The only item as to which any further discussion is warranted in this regard is Bandyopadhyay's demand for "documents and objects related to proceedings relating to Bandyopadhyay in Ecuador." Memo. at 13. The government writes in its opposition that it does not have custody or control of such documents, Opp. at 20, but that assertion is at least arguably in tension with the representation that Raudenski made in his affidavit in support of the application for a warrant to search the Apartment that "*information* concerning Bandyopadhyay's arrest and conviction in Ecuador was supplied by the Ecuadorian government." Warrant Aff. ¶ 22 n.2 (emphasis added). Whether the "information" to which

Raudenski referred was in the form of a discoverable document is of no moment: I agree with the government that such materials, even if in the government's possession, are not conceivably material to a defense of the pending charges. *See* Opp. at 20-21. Accordingly, notwithstanding Bandyopadhyay's assertion to the contrary, the government would therefore have no disclosure obligation under Federal Rule of Criminal Procedure 16(a)(1)(E)(i). I therefore respectfully recommend that the court deny as moot the defendant's discovery motion.

IV.     Constitutionality Of The Walsh Act

Bandyopadhyay challenges the constitutionality of two separate provisions of the Walsh Act relating to, respectively, his discovery rights and the conditions of his pretrial release. As explained below, I conclude that he is not entitled to any relief on either challenge.

A.      Discovery

Section 504 of the Walsh Act, codified at 18 U.S.C. § 3509(m), mandates a restriction on discovery in cases involving child pornography by forbidding a court from requiring the government to provide such material to a defendant "so long as the government makes the ... material reasonably available to the defendant." Bandyopadhyay contends that, notwithstanding the quoted proviso, the statute deprives him of his rights under the Fifth and Sixth Amendments to the Constitution. He raises both a facial challenge to the provision and, alternatively, an as-applied challenge. As explained below, neither theory is properly before the court – partly because the government concedes that the statute mandates discovery consistent with a defendant's constitutional rights, and partly because Bandyopadhyay has failed to demonstrate that the discovery the government has agreed to provide is constitutionally deficient.

1.    The Facial Challenge

Bandyopadhyay argues that Section 3509(m) is unconstitutional because it interferes unreasonably with several rights guaranteed by the Fifth and Sixth Amendments, including his rights to due process, to confront witnesses, to present testimony favorable to his defense, and to the effective assistance of counsel.  Bandyopadhyay further argues that Section 3509(m) runs afoul of the presumption of innocence.  Memo. at 19-24.  Neither argument is persuasive.

The statute provides that "[i]n any criminal proceeding, any property or material that constitutes child pornography ... shall remain in the care, custody, and control of either the Government or the court."  18 U.S.C. § 3509(m)(1).  It further prohibits the defense from photographing, duplicating, or otherwise reproducing any material that constitutes child pornography, "so long as the Government makes the property or material reasonably available to the defendant."  *Id.* § 3509(m)(2)(A).  Such material is deemed "reasonably available" if the Government provides the defendant, his or her counsel, and any individual that the defendant may seek to qualify as an expert at trial, with "ample opportunity for inspection, viewing, and examination [of the property or material] at a Government facility."  *Id.* § 3509(m)(2)(B).

There is no question that the provision imposes a burden on a criminal defendant's ability to prepare for trial that the law does not impose in other contexts.  That is not an accident: Congress enacted the provision because it was willing to impose such a burden rather than allow the fresh harm to the victims of child pornography that occurs with each new reproduction and viewing of such material.  *See United States v. Doane*, 501 F. Supp. 2d 897, 901 (E.D. Ky. 2007).  But the fact that Congress burdened the defense function does not necessarily render the statute unconstitutional.  Due process requires that criminal defendants be afforded "a fair opportunity to defend against the State's accusations."  *Chambers v. Mississippi*, 410 U.S. 284,

294 (1973). Bandyopadhyay's facial challenge therefore can only succeed if he can show that "no application of the statute's safety valve provision ('ample opportunity for inspection, viewing, and examination at a Government facility') would be sufficient to [satisfy that requirement for] any criminal defendant." *United States v. Knellinger*, 471 F. Supp. 2d 640, 644 (E.D. Va. 2007) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)). That he cannot do.

Other courts that have addressed facial challenges to Section 3509(m) have held, and the government acknowledges, that the statute's "ample opportunity" provision means that if the government does not provide access to the material at issue to an extent that is at least sufficient for purposes of due process, the court can order the government to produce that material to the defendant. *See, e.g.*, *United States v. Tyson*, 2007 WL 2859746, at *3 (W.D.N.Y. Sept. 26, 2007); *United States v. Battaglia*, 2007 WL 1831108, at *5 (N.D. Ohio June 25, 2007); *United States v. Renshaw*, 2007 WL 710239, at *1 (S.D. Ohio March 6, 2007); *Doane*, 2007 WL 1500301 at *3-5; *Knellinger*, 471 F. Supp. 2d at 645; Opp. at 25. Thus, the government agrees that it cannot rely on the Walsh Act to withhold any material that the Constitution requires to be provided; stated another way, the government concedes that if the form of access to the contraband material that it agrees to provide to a defendant is deemed unconstitutional, then it must either grant greater access to the material or produce the material itself. In such circumstances, there is no reason for the court to consider a facial challenge to the statute – it need only consider whether the form of access provided in this case passes constitutional muster.

Bandyopadhyay's argument that section 3509(m) violates the presumption of innocence because it applies prior to a judicial determination that the materials at issue are in fact child pornography is equally unavailing. A determination that the material in the government's possession is child pornography for purposes of the discovery provision does nothing to relieve

24

the government of the burden of proving the nature of that material at trial, and nothing prevents

Bandyopadhyay from contesting that those materials are in fact child pornography. *See*

*Battaglia*, 2007 WL 1831108 at *2; *Renshaw*, 2007 WL 710239 at *1 (noting that the Walsh Act

does "no harm to Defendant even if he disputes the classification of the material as contraband"

because he will be acquitted if "the government fail[s] to meet its burden of proof in establishing

beyond a reasonable doubt that the material constitutes child pornography"). The grand jury's

finding of probable cause to believe that the material at issue in this case constitutes child

pornography suffices only to trigger the Walsh Act's discovery restriction, *Battaglia*, 2007 WL

1831108 at * 2, but neither that finding, nor the Walsh Act itself, does anything to establish any

element of the offense that the government must prove at trial beyond a reasonable doubt, and

the government does not argue to the contrary. Thus, because the government does not take any

position in reliance on the Walsh Act that is inconsistent with the presumption that

Bandyopadhyay is innocent, this aspect of his challenge is also moot.

> 2.      The As-Applied Challenge

As an alternative to his facial challenge, Bandyopadhyay argues that Section 3509(m) is

unconstitutional as applied in this case because the government does not intend to make the

alleged child pornography reasonably available to the defense. Memo. at 19; Reply at 10-12.

By its very nature, such a challenge is moot because, as the government agrees, any form of

access to the alleged contraband that does not satisfy the requirements of due process will serve

only to lift the statutory prohibition against requiring the government to produce the material to

the defense. *See* 18 U.S.C. § 3509(m)(2)(A); *Battaglia*, 2007 WL 1831108 at *5; *United States*

*v. O'Rourke*, 470 F. Supp. 2d 1049, 1055 (D. Ariz. 2007) ("The statute's denial of the defense

teams' possession of the alleged child pornography is not absolute ... if [the Government] cannot

make the alleged child pornography "reasonably available" ... then the statute does not require that the material be withheld.").

The court could completely dispose of the pending motion by going no further in its analysis: the constitutional challenge to Section 3509(m) is mooted by virtue of the government's acknowledgment of its obligations under the Walsh Act because there is no possibility in this case that the government will seek to rely on the statute to withhold anything from the defendant that due process requires to be provided. Nevertheless, it is clear that Bandyopadhyay takes the position that the government has not provided and will not provide a level of access or disclosure that will meet the requirements of due process. Although Bandyopadhyay has thoroughly failed, despite repeated opportunities to cure the failure, to raise that complaint in a properly justiciable form, I offer my analysis of that position here to avoid the delay resulting from any further referral once the issue becomes ripe for review. *See United States v. Ingrassia*, 392 F. Supp. 2d 493, 496 (E.D.N.Y. 2005) (overruling objection to explicitly advisory portion of magistrate judge's report and recommendation concerning disposition of potential future developments in a case; "a report and recommendation of a magistrate judge is suppose[d] to be advisory, so that it may advise the district court as to how it should proceed on a particular issue or case"); *United States v. Cooper*, 135 F.3d 960, 963 (5th Cir.1998) ("the magistrate's role under [28 U.S.C.] § 636(b) is advisory, not adjudicatory").

The question that Bandyopadhyay seeks to raise is whether the level of access to the alleged child pornography in this case that the government proposes to provide (as outlined at oral argument and clarified in the government's post-hearing brief) affords Bandyopadhyay a constitutionally adequate opportunity to prepare for trial. For the reasons explained below, I conclude that it does.

The government has offered to provide Bandyopadhyay and his defense team with a mirror image copy of the hard drive seized from Bandyopadhyay's Apartment, which contains all of the alleged child pornography at issue in this case. Bandyopadhyay, his counsel, and any expert he may seek to qualify at trial, will be permitted to examine the materials in a private room at an ICE facility. The defense team and any person it brings to the facility must present identification to gain entry, but the identity of those individuals will not be disclosed to the prosecution.[8] The defense team will be permitted to work at the ICE facility without supervision by the government, provided that each member of the team must agree to submit to a search before leaving the facility. Tr. at 121-24; 142-46.

The government will provide access to the facility on a reasonable as-needed basis – at least during normal business hours, and at other times pursuant to reasonable requests. To the extent that it is able, the government will also provide the computer equipment necessary to examine the materials; if any putative expert on the defense team requires different or additional equipment, the expert will be permitted to bring it to the facility and use it, subject to the conditions that the equipment be left at the facility for the duration of the case and "wiped clean" of any contraband, under the supervision of a government agent, at the end of the case. The

---

[8] Bandyopadhyay's counsel represented at oral argument that he may seek to have lay persons view the seized evidence, notwithstanding the statutory requirement that access to child pornography be given only to "the defendant, his or her attorney, and any individual the defendant may seek to qualify to furnish expert testimony at trial." 18 U.S.C. § 3509(m)(2)(B). The parties have agreed that if Bandyopadhyay seeks to provide such access to any lay person, he must first make an *ex parte* application to the court. *See* Tr. at 144-46. I do not understand how the Constitution might require that Bandyopadhyay or his counsel must have the benefit of a lay person's first-hand assessment of the material at issue in order to obtain a fair trial, and the government understandably reads the Walsh Act to prohibit such access. Nevertheless, if the court decides under the circumstances of a particular application that the Constitution does require a lay person associated with the defense to have access to the material, it is implicit in the government's position that the Walsh Act would also have to be interpreted to allow such access.

defense team will be permitted to save its work at the ICE facility onto external disks and store the disks in a locked container in the private room to which federal agents will not have access. Tr. at 121-24; 142-46. Finally, the government notes that its proposal is not intended to be exhaustive; "[t]o the extent the defense communicates reasonable requests to the government concerning its needs, the government intends to accommodate [them]." DE 57 (Government's Reply to Bandyopadhyay's Post-Hearing Supplemental Brief) ("Supp. Reply") at 9.

Bandyopadhyay's argument that the government's proposal fails to provide him with "ample opportunity" to examine the alleged child pornography in this case relies heavily on the decision in *Knellinger*. His reliance on that case is misplaced: leaving aside the critiques that it is not controlling precedent in this jurisdiction and is apparently the sole case in which a court found that the government had failed to meet the Walsh Act's "reasonably available" standard, *see Battaglia*, 2007 WL 1831108 at *5, the *Knellinger* decision provides little useful guidance here because it is factually distinguishable. The defendant in *Knellinger* presented considerable evidence in support of his argument that the government had not made the materials at issue reasonably available:

> [F]our witnesses ... testif[ied] as to why inspection at a government facility did not provide "ample opportunity" to inspect, view, and examine the material in that case. Among those witnesses, one testified that, based on the Supreme Court's decision in *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002), a defendant may pursue a viable defense that the children in the alleged pornography are not real children, but are virtual children or the result of computer-enhanced images not prohibited by law. [*Knellinger*, 471 F. Supp. 2d] at 646-47. Such a defense, the attorney testified, made expert analysis "absolutely essential." *Id.* at 647. In addition, two digital video experts testified that analysis at a government facility would significantly increase the cost and effort of the job. *Knellinger,* 471 F. Supp. 2d at 647-48. More importantly, both experts testified that transporting their equipment to the government facility would be difficult, expensive, and may cause concerns about the reliability of the equipment after the move. *Id.* Because

of the problems in transporting the equipment, including the effect it would have on their ability to perform their jobs, both testified that they "would not agree to work on a case like Knellinger's ..." *Id.*

*Battaglia*, 2007 WL 1831108 at \*5.

Bandyopadhyay's counsel raised some of these arguments in the instant case at a status conference on July 10, 2007, as did his putative expert, one Thomas Owen ("Owen").[9] But when provided an explicit opportunity to develop a factual record to support his claim – precisely the kind of record that the defendant in *Knellinger* took pains to develop – Bandyopadhyay declined. *See* DE 33; Electronic Order dated August 28, 2007. Neither Owen nor any other putative defense expert appeared at the evidentiary hearing before me on September 6, 2007.[10] Thus, even if *Knellinger* stands for the proposition for which Bandyopadhyay cites it, there is no reason to believe that it is apposite in the circumstances of this case.

The government has attempted in good faith to accommodate Bandyopadhyay's perceived needs within the confines of the statute, Supp. Reply at 9-10, and the terms of its proposal are more than reasonable. More to the point, its proposal appears to be more than adequate to give Bandyopadhyay a fair opportunity to prepare for trial, if only he will deign to take advantage of it. Due process does not require unrestricted access to the alleged child pornography in defense counsel's office, nor does it require a court to defer to defense counsel's

---

[9] I did not take testimony from Owen at the July 10, 2007 conference, but instead sought his input to help the court and the parties develop a better understanding of the facts that would underlie Bandyopadhyay's anticipated motion, and in the hope of narrowing the scope of the parties' disagreement. July 10 Tr. at 39-40. Owen identified obstacles associated with performing his work at a government facility, but did not rule out the possibility of reaching an acceptable compromise. July 10 Tr. at 28.

[10] At the July 10, 2007 status conference, Bandyopadhyay's counsel represented that Owen had signed an affidavit asserting that he would refuse to work on this case if forced to conduct his analysis at a government facility. July 10 Tr. at 38-39. Bandyopadhyay did not file any such affidavit on the electronic docket despite my encouragement that he do so.

unyielding insistence on the manner of preparation he prefers. Bandyopadhyay cites no authority to the contrary and I have found none. If Bandyopadhyay attempts to prepare for trial under the regime the government proposes and finds himself stymied, he can seek relief from the government by consent or from the court by judicial fiat. But until he makes such an effort, there is simply no reason to believe that the government's proposal provides anything less than the law requires.

> B.    Conditions Of Release

Section 216 of the Walsh Act, codified at 18 U.S.C. § 3142(c)(1)(B), mandates that "[i]n any case that involves a minor victim under [several listed statutes] ... any release order shall contain, at a minimum, a condition of electronic monitoring" as well as several other specific conditions. By so providing, the Walsh Act trumps the Bail Reform Act's general rule that a defendant must be released on either personal recognizance, an unsecured bond, or the "least restrictive" conditions that will assure the defendant's return to court and the safety of the community. *See* 18 U.S.C. § 3142(b), (c)(1). Bandyopadhyay challenges the provision as unconstitutional under the Eighth Amendment's proscription of excessive bail requirements, the Fifth Amendment's guarantee of due process, and the separation of powers doctrine. DE 43.[11] In doing so, he relies on *United States v. Crowell*, 2006 WL 3541736 (W.D.N.Y. Dec. 7, 2006), in which a magistrate judge sustained such challenges. *See also United States v. Vujnovich*, 2007 WL 4125901, *2 (D. Kan. Nov. 20, 2007) (adopting "the well-reasoned constitutional analysis set forth by the court in *Crowell*"). As explained below, his challenge is moot.

---

[11] Bandyopadhyay properly submitted his challenge to electronic monitoring directly to me for decision, DE 43, rather than as part of the omnibus suppression and discovery motions referred to me for a report and recommendation. Accordingly, this portion of my discussion constitutes an order that is subject to review pursuant to Rule 59(a) of the Federal Rules of Criminal Procedure rather than a recommendation that is subject to review pursuant to Rule 59(b)(2).

When Bandyopadhyay first appeared before the court on October 10, 2006, the duty magistrate judge released him on a secured bond subject to a variety of conditions, but did not require electronic monitoring. *See* DE 7 (minute entry for initial appearance); DE 8 (bond). The next day, the same magistrate judge entered a supplemental order adding still more conditions to the bond. Because there is a dispute about the significance of that order, I reproduce its text in full:

> Because defendant Kamal Bandyopadhyay was arrested on charges of violating 18 U.S.C. § 2254(a)(4), the order of release dated October 10, 2006 is supplemented with the following additional conditions, in accordance with the recent amendments to § 3142(c) of the Bail Reform Act. <u>See</u> [the Walsh Act].
>
> 1. Defendant is subject to electronic monitoring and must pay for the costs of such monitoring.
>
> 2. Defendant must reside with his brother and is subject to home detention between 10:00 p.m. and 7:00 a.m. every day.

DE 9.

As the government later acknowledged in responding to the instant motion, the crime with which Bandyopadhyay was originally charged (and the only offense for which he stood indicted at the time of the instant motion and of the government's response), was a violation of 18 U.S.C. § 2254(a)(4) – which does *not* trigger the Walsh Act's bail provisions. DE 52 at 1; *see* 18 U.S.C. § 3142(c)(1)(B) (requiring electronic monitoring and other conditions only in certain cases under 18 U.S.C. §§ 1201, 1591, 2241, 2242, 2244(a)(1), 2245, 2250, 2251, 2251A, 2252(a)(1)-(3), 2252A(a)(1)-(4), 2260, 2421, 2422, 2423, and 2425). Thus, the government wrote that "to the extent the bail determination was based on an erroneous interpretation of the requirements of the Bail Reform Act, this Court may remove the defendant from electronic monitoring." DE 52 at 1-2.

The record left two matters unclear that were relevant to the disposition of the instant constitutional challenge to the Walsh Act. First, it was not obvious that the duty magistrate judge had imposed the supplemental conditions because of an erroneous view that they were required under the Walsh Act, or rather as additional conditions – similar to those now required in cases involving similar charges – that the court deemed prudent in light of the nature of the charges. The supplemental order explicitly cited the charges pending against Bandyopadhyay but did not explicitly state that the nature of the charges *required* additional conditions of release under the Walsh Act; instead, it stated only that the additional conditions were "in accordance with" the statute. To be sure, it is an entirely natural reading of the order to interpret it as an erroneous interpretation of a new law; but that reading is by no means the only one that is plausible.

Second, the government's letter stated only that electronic monitoring could be removed "to the extent" that its imposition had been based on an error of law; the government did not say whether it believed such monitoring should nevertheless be required to assure the defendant's return to court and the safety of the community pursuant to provisions of the Bail Reform Act unaffected by the Walsh Act. The possibility that the government might believe such monitoring to be warranted was bolstered by the fact that it had initially opposed any form of release in this case and had instead sought a permanent order of pretrial detention. *See* DE 7.

Accordingly, when the parties appeared before me for argument on September 6, 2007, I solicited their respective positions on those matters. The government argued that electronic monitoring should be imposed as a condition of release notwithstanding the inapplicability of the Walsh Act. Bandyopadhyay argued that I was simply not free to consider the issue, because he took the position that the duty magistrate judge had conclusively determined that electronic

monitoring was not required but for prescription of the Walsh Act. He was so insistent on that position that he declined repeated invitations to provide argument as to the discretionary imposition of electronic monitoring even after I stated explicitly that I believed the record was unclear and that I would therefore make a *de novo* decision as to the need for such monitoring. *See* Tr. at 114-17; DE 53. After considering the Pretrial Services Report, I determined that – wholly independent of any provision of the Walsh Act – electronic monitoring was required to assure Bandyopadhyay's return to court and the safety of the community, and therefore ordered that it remain a condition of Bandyopadhyay's release. DE 53.

Bandyopadhyay has sought the court's review of that decision, and his application remains pending. DE 55. In the interim, the grand jury has returned a superseding indictment charging Bandyopadhyay with additional violations, including several under 18 U.S.C. § 2252(a)(2). DE 61. Those new charges *do* trigger the Walsh Act's electronic monitoring requirement. 18 U.S.C. § 3142(c)(1)(B). That fact renders moot the controversy over whether I should have made a *de novo* determination of the need for electronic monitoring in the absence of any statutory mandate. If the Walsh Act is constitutional, then electronic monitoring must be imposed even if there was no basis for me to address the issue on September 6, 2007. On the other hand, even if the statute is unconstitutional, the court would still be free to set appropriate conditions of release and to consider electronic monitoring as one such condition – and would not be bound by a prior determination made when there were fewer charges pending against Bandyopadhyay, each of which carried less severe sentencing consequences than those added in the superseding indictment. *Compare* 18 U.S.C. § 2252(b)(2) (10 year maximum for first violation of § 2252(a)(4)) *and* U.S. Sentencing Guidelines Manual § 2G2.2(a)(1) (prescribing base offense level of 18 for violation of § 2252(a)(4)) *with* 18 U.S.C. § 2252(b)(1) (20 year

maximum for first violation of § 2252(a)(2)) *and* U.S. Sentencing Guidelines Manual

§ 2G2.2(a)(2) (prescribing base offense level of 22 for violation of § 2252(a)(2)).  Either way,

the decision made on October 10, 2006, to forego electronic monitoring under the circumstances

then prevailing would provide no basis for precluding electronic monitoring now.

My decision of September 6, 2007, mooted the challenge to the Walsh Act's bail

provision because it determined the need for electronic monitoring without regard to that

provision, which the parties agreed did not apply to the original indictment that was then

pending.  Arguably, the addition of new charges in the superseding indictment resuscitates the

constitutional challenge, because now the Walsh Act does apply.  I conclude, however, that the

issue remains moot for the following reason.  Even if I were to agree with Bandyopadhyay's

constitutional argument – and, more to the point, with the thorough and persuasive analysis by

Magistrate Judge Foschio in the *Crowell* decision – the result would be no more than that

electronic monitoring would no longer be mandated by any statute.  Such a conclusion would not

in itself require me to discontinue the electronic monitoring requirement; to go that far I would

have to make an independent determination under the pre-Walsh Act version of the Bail Reform

Act about the need for such a condition of release.  But I have already made just such a

determination – the one I made on September 6, 2007.  While the circumstances have changed

since then, by virtue of the new charges in the superseding indictment, they have only

heightened the need for safeguards against the risk of flight and danger to the community.

Accordingly, regardless of the outcome of Bandyopadhyay's constitutional challenge, I

would require Bandyopadhyay to remain subject to electronic monitoring.  As a result, the

constitutional challenge – however compelling it may be on the merits – is plainly moot.

V.    <u>Recommendation</u>

For the reasons set forth above, I respectfully recommend that the court deny defendant Bandyopadhyay's omnibus pretrial motions.

VI.    <u>Objections</u>

This Report and Recommendation will today be filed electronically on the court's ECF system and is therefore deemed served on the parties as of today's date. Any objections to this Report and Recommendation must be filed with the Clerk no later than December 21, 2007. Failure to file objections within that period will waive the right to appeal the district court's order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59 (b)(2).

**SO ORDERED.**

Dated: Brooklyn, New York
       December 4, 2007

<u>/s/ James Orenstein</u>
JAMES ORENSTEIN
U.S. Magistrate Judge